

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## 06-20-00023-CV

_____

IN THE INTEREST OF Z.T., A CHILD

On Appeal from the 307th District Court
Gregg County, Texas
Trial Court No. 2018-2052-DR

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Burgess

MEMORANDUM OPINION

On October 23, 2018, the Department of Family and Protective Services (the Department) removed Z.T.[1] from his mother's (Mother) care for the third time. Each time, Z.T. was removed because of Mother's neglectful supervision related to her abuse of alcohol. On March 24, 2020, the trial court entered its order terminating Mother's parental rights under statutory grounds (D) and (E).[2] *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E) (Supp.). In this appeal, Mother asserts (1) that the evidence was legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the best interest of Z.T. and (2) that the Department waived, or was estopped to assert, its right to seek termination of her parental rights. Because we find that the evidence was legally and factually sufficient to support the trial court's best-interest finding and that Mother waived her waiver or estoppel complaint, we affirm the trial court's judgment.

## I.    Sufficient Evidence Supported the Trial Court's Best-Interest Finding

### A.    The Evidence at Trial

The testimony showed that when Kelsey Drennan, an investigator for the Department, and Christopher Byrdsong, a Longview police officer, went to Mother's residence in October 2018 to investigate a report of possible negligence concerning Z.T., the knob on the front door was missing. When Byrdsong knocked on the door, it opened and only Z.T. and his older brother, Ziggy, were home. In the living room were several piles of trash that had been recently assembled.

---

[1] We refer to the child by his initials, and to his family members by pseudonyms. *See* TEX. R. APP. P. 9.8(b)(1).

[2] The parental rights of Z.T.'s father were also terminated. Only Mother appeals.

Ziggy said that Mother was at a meeting. He also informed them that he and Z.T. had not eaten because the electricity was off, and he was worried about eating the food in the refrigerator. There was trash throughout the residence and several alcohol bottles were on the floor in the dining area. Z.T.'s room was filled with toys, LEGOs, and trash. Z.T. took Drennan to Mother's bedroom where he said he slept on the corner of the mattress. A piece of pizza was on the bed by the corner. When he was asked where Mother slept, he moved a blanket that revealed an oval shaped stain that smelled of urine and feces. Z.T. explained that his Mother would get too intoxicated and would go to the bathroom and vomit on herself. The pizza was within two feet of the oval stains.

At the time, Z.T. was seven years old, and Ziggy was sixteen. They had not gone to school because Mother was too intoxicated to get them up and drive them. Ziggy told Drennan that he had cut up Mother's credit cards so she could not buy alcohol, but that Mother then used food stamps to buy cooking wine that she could drink. Drennan noted that Ziggy was acting as the adult and that Z.T. had no one to make sure he was bathing, going to school, or eating. Drennan described Z.T. as matter of fact and testified that he kept saying his Mother was sick. Ziggy told Drennan that Mother had had several alcohol relapses since January 2018.

When Drennan went outside to call her supervisor, Mother arrived and said that she knew why they were there and that she had just left an Alcoholics Anonymous (AA) meeting. Mother told Drennan that the last time she had a drink was at two o'clock that morning. Drennan described Mother as calm and cooperative. She did not know how many AA meetings Mother had attended that day.

Drennan also testified that before she went to the residence, she had reviewed the family history with the Department. The first case was opened in 2015 when Z.T. was three years old. Mother had driven while intoxicated with Z.T. in the car from Longview to Ore City. When the Department responded to the residence, Mother was intoxicated, and Z.T.'s maternal grandmother came and got him. An investigation was opened, and several weeks later, law enforcement found Mother passed out behind the wheel of her vehicle in a Walmart parking lot. She had a black substance, which was found to be urine and feces, on her clothes and in her mouth. Mother's blood alcohol content was determined to be four times the legal limit, and she had to be hospitalized for several days. When Mother was released from the hospital and indicated she was going to live with her mother, Z.T. was removed because of concerns for his safety. Mother ultimately worked all of her services and got sober; Z.T. was then returned to her care, and the case was dismissed in January 2016.

A second case involving Z.T. was opened in December of that year when law enforcement was called to Mother's apartment. They found the apartment in disarray, with a very strong foul odor and alcohol bottles throughout. The mattress that Mother and Z.T. slept on had urine and feces on it, and there was a trail of urine and feces leading to the bathroom. Mother was highly intoxicated and unconscious. In that case, Mother again worked her services and got sober, resulting in Z.T. being returned to her care and the dismissal of the case in January 2018.

Drennan agreed that Mother's history with the Department showed a pattern in which Mother has been able to demonstrate sobriety for a period of time, but has not been able to show continuous sobriety and the ability to provide a stable environment for Z.T. She also agreed the

4

back and forth between removal, then return to living in filth when Mother was intoxicated, was not good for Z.T. She opined that children need stability to be successful and that it would be harmful to a young child to not know whether he will eat, go to school, or have his basic needs met.

When Dana Dessesaure, the Department's caseworker assigned to the case, reviewed the family history, she also was concerned about Mother's alcohol use and her ability to stay clean. She testified that Mother did not have an issue with working her services and getting sober, but that she had not been able to show that she can maintain sobriety. She noted that Mother was able to maintain sobriety while the Department had custody of Z.T., but that she would relapse when he was returned to her.

At the beginning of the case, Dessesaure suggested that Mother go into inpatient treatment for her alcohol abuse, but Mother wanted outpatient treatment. Then, in January 2019, Mother decided to go to Graciously Broken (GB), a live-in one-year program. Dessesaure testified that GB offered every service and held its clients' hands every step of the way. She said that Mother had done great there and completed the program in January 2019. At the time of trial, Mother was living at GB's alumni house, was working full-time, and had her own vehicle. Dessesaure also testified that Mother had completed all of her services and that she had done everything the Department asked her to do.

Nevertheless, Dessesaure testified that the Department's goal for Z.T. from the beginning was termination of Mother's parental rights and adoption by his uncle and aunt because of the two previous cases. She testified that in those cases, Mother had also completed all of her services, yet

5

had the same issues again in less than a year each time. After those cases were dismissed, Mother would progress to the point where she was unable to care for herself or for Z.T. In this case, since Mother had lived at GB, and then at its alumni house, Dessesaure was unable to judge whether Mother had made any long-term improvement. She noted that while in Mother's care, Z.T. was not having his needs met, he was not being properly cared for, and he was missing school. Although he needed eye surgery, Mother did not want him to have it. While in Mother's care, Z.T. slept and ate next to feces, and he was not safe because she would pass out when she was intoxicated.

Dessesaure testified that when this case began, Z.T. was emotionally shut down and was not able to express himself. Z.T. did not smile, barely talked, gave only "yes" and "no" answers, and was withdrawn. She said that Z.T. was initially placed in a shelter and was later placed with his uncle and aunt, Mitch and Holly.

Bill Schroeder, Z.T.'s court-appointed special advocate, first met Z.T. when he was in the shelter. He described Z.T. as zombie-like, with no emotion, no laughing, no crying, and no smiling. Schroeder testified that Z.T. was difficult to engage and that he responded to his questions so softly he could not hear him. Z.T. could not read the word "happy" and could not tell him its meaning. He also testified that Z.T. did not know how to shower or brush his teeth, that he had a lazy eye that needed surgery, and that he was socially undeveloped.

Schroeder began to see a change about two or three months after Z.T. had been placed with Mitch and Holly. The first change he saw was that Z.T. now said that he had a family. Z.T. also began succeeding in reading and was excited to read. Mitch and Holly also taught Z.T. basic

6

hygiene skills and taught him the difference between proper and improper behavior. Dessesaure also testified that Z.T. had been doing great since his placement with his uncle and aunt. Z.T. became very talkative and engaging, looked a person in the eye when he talked, and smiled and seemed happy. She testified that Mitch and Holly had addressed all of his medical needs, got him inserts for his flat feet, and had him involved in community activities. In their care, Z.T. had friends and sleepovers, he went on outings and went to school every day, and he was catching up in school and making good grades. Since being with Mitch and Holly, Z.T. had matured, showed affection towards people, and made eye contact.

Pennye West, a licensed professional counselor, was Z.T.'s play therapist and first saw Z.T. in January 2019. She described him at that time as very compliant, very shut down, withdrawn, and having flat affect. He would not interact or play, or he went to a corner opposite her chair and played with his back to her. If she asked him a question, he would shrug his shoulders or make a whispering response and would not smile. She also testified that typically the first two or three times she sees children, they will have exploratory play with all the variety of toys that she has in her office. Then, in the third session, their play becomes therapeutic play. However, Z.T. did not exhibit exploratory play until their fifth session. She explained that this meant that he had been emotionally and developmentally shut down by some kind of trauma or emotional distress. She attributed his condition to the environment that he was in when he was removed. West explained that when children see that the adults in their world are not in control of themselves, they begin questioning how they will be okay and survive physically, mentally, and emotionally.

7

Her goal with Z.T. was to get his emotion and thought processes lined up so that he would be typical and appropriate with his emotions; to be appropriate with his age, play, and interaction; and make eye contact, gain self-confidence, and express himself. She testified that at the time of trial, he could verbalize his emotions and demonstrate them quite well. At times, he came and was very excited and happy, jumped around, and demonstratively told her about something. At other times, he came in angry and destroyed the playroom by throwing toys. West testified that Z.T. was in a wonderful place at the time of trial and that he talked about feeling loved and feeling safe.

Holly testified that Z.T. came to live with Mitch and her in December 2018. She described him as emotionally shut down and monotone and said that he would not get excited about anything or ask for anything. He had no table manners and could not bathe himself, make his bed, dress himself, tie his shoes, or wipe himself after using the restroom. He also could not read and did not want to go to school. He did not want to go to bed and would have terrible nightmares three or four times a week in which he would scream out, "No, Mama, no."

After about two weeks, Z.T. began calling Holly "mother" and Mitch "dad." By the end of the school year, Z.T. had opened up and began talking about his feelings. He bathed himself, used the restroom by himself, and made his bed. His emotions also became more normal—he got upset when he should have been, was happy when he should have been, got excited when he got near a toy aisle, and wanted toys that a normal eight-year-old boy would want. Holly testified that at the time of trial, he read everything, he was on the A-B honor roll at school, he had confidence in himself, and he wanted to do everything himself. According to Holly, he would tell her what he needed and he felt safe and secure.

8

Schroeder, Dessesaure, West, and Holly also testified about Z.T.'s visits with Mother and the effects the visits had on him. Initially, the visits alternated between Longview, where Z.T. had lived with Mother, and Sulphur Springs, where he resided with Mitch and Holly. Schroeder testified that he observed three visitations, early on in the case and two at the end. He testified that Mother smothered Z.T. and coerced him into shows of affection to excess. Z.T. did not initiate the shows of affection and resisted them, but eventually got used to them. He also testified that Mother and Z.T. had normal conversations, that Mother brought activities and gifts, and that Z.T. was more relaxed and engaged more in the second half of the case when West supervised the visits. Schroeder also observed that Mother's communication was appropriate, that she was able to engage Z.T., and that she kept him busy.

Schroeder also testified that he had had conversations with Holly regarding Z.T.'s behavior before and after Mother's visits. He testified that Z.T. had exhibited anger, hostility, remorse, depression, and anxiety attacks either immediately before or immediately after a visit. According to Schroeder, before visits, Z.T. did not eat and did not want to go to school; after visits, he displayed hostility at school, which he never did at other times. Holly testified that Z.T.'s nightmares increased after he had a telephone call or visit with Mother. She said that after telephone calls with Mother, Z.T. acted out, and that at times he squeezed the head of her mother-in-law's dog, hit her hand as hard as he could, and slammed doors. This behavior subsided after a couple of days. Holly also testified that when Z.T. had to go to Longview for visits he shut down completely and would not eat, sleep, or do his homework immediately after finding out a visit was scheduled. When he returned from Longview, he was usually very aggressive. She testified that

9

when visitation was in Sulphur Springs, Z.T. did not shut down completely even though he might not want to go. He still had nightmares and exhibited aggression after the Sulphur Springs visits.

Holly also testified that when West began supervising the visits, in October or November, Z.T. got excited about seeing West, but did not mention Mother. After West began supervising the visits, Z.T. still had nightmares, but the aggressive behavior subsided a good deal. Holly also related that a couple of weeks before trial, Mother told Z.T. on a telephone call that she passed by his school every day, and Z.T. looked terrified and froze. After the telephone call, Holly and Mitch explained to him that Mother meant she passed by his old school in Longview, not his school in Sulphur Springs. After this explanation, Z.T. calmed down.

Dessesaure supervised the visits in both Longview and Sulphur Springs at the beginning of the case. She testified that in the beginning, Z.T. was really quiet and did not eat on the way to visits. Mother brought food and things for them to do, and Z.T. played and talked with her. He did not offer spontaneous displays of affection, but Mother kissed him constantly to which he did not react. After the visits, Z.T. would loosen up a bit. Dessesaure testified that Z.T. became less anxious about the visits after he started counseling with West. Still, Mother brought toys and got upset if Z.T. did not play with them. Mother also got upset if Z.T. played with something Holly and Mitch gave him, instead of the gifts she brought. When this happened, Mother wanted Z.T. to return the gifts she had brought. Dessesaure also testified that when Mother got upset, her response was to get hostile. She said that the Longview visits were ended by court order after the trial court read West's notes. In addition, Dessesaure testified that Z.T. continued to act out after visits and that the Department did not recommend unsupervised visitation.

10

On cross-examination by Mother, Dessesaure read highlighted portions of the notes made after the visits she supervised. She acknowledged that Mother came prepared for the visits, that she tried to engage and interact with Z.T., and that she acted appropriately. She also acknowledged that there were no problems at the visits, except on July 23, when Mother talked to Z.T. about coming home with her.

West testified that Z.T.'s worst display of anger followed a visit with Mother in June or July. At that session Z.T. beat up a boy doll and threw it, then he got all of the toy guns, knives, and protective gear to protect himself, and he continued yelling and throwing. When she asked what was going on, he started crying and said, "I'm scared. I'm mad. I don't want to go back and live with my Mother." She learned that there had apparently been talk about where he would live, and he was already anxious about the visits, especially in Longview. She explained that he had a great fear that he would not be brought back home to Mitch and Holly. She added that when Z.T. was beating up the dolls, he said, "I'm not a baby. I'm okay. You can't tell me what to do. I said, 'I want to eat.' I'm not going to do that. You can't make me."

West also testified that Z.T. got better when she started supervising the visits. When she moved the visits to her office, Z.T. told her that he liked that more because he knew nobody could take him from there and that she would not let Mother take him away. She testified that he told her this in the latter part of 2019 and that over a year after removal, Z.T. still had that deep, strong fear. This fear came out in his play behavior that had a safety and fear theme and lasted longer after a visit. She explained that Z.T. would still swing from not expressing his emotions to over expressing them but that he had become more centered. He had his biggest swings after a visit

with Mother. Also, after a telephone call with Mother, Z.T. was more adamant that he had a family that loves him and wants him. After a visit, Z.T. had anger outbursts and babyish, regressive behavior, neither of which occurred the rest of the month.

West's description of the visits that she observed were consistent with Dessesaure's. She added that Mother's and Z.T.'s communication was pretty surface, that he was very compliant, and that he loved his Mother and was glad to see her. However, he did not initiate affection but complied when she asked for it. On cross-examination by Mother, West testified that she had not seen progress in the visits and that they were pretty level and consistent. She also testified that sometimes Z.T. exhibited anxiety at the visits, either a nervous, silly anxiety or by clenching his fists, but that he was able to get himself out of it.

West testified that she does not think a continuation of visitation by Mother would be productive or good for Z.T. emotionally. She said that Z.T. lives in a steady, stable, and predictable environment and that the visits stall him and set him back. She testified that she had asked Z.T. if he wanted more visits and he quickly said, "No, no. I'm good like it is." She discovered that it took him from one visit to the next to emotionally and psychologically prepare for the next visit. West opined that if Z.T. were placed back in Mother's home, it would cause a tremendous regression for him, and that if the same pattern continued, Z.T. would regress at some point in his life where he would no longer grow emotionally and would remain in survival mode. She opined that the best thing for Z.T. was to remain with Mitch and Holly and that if visitation were maintained for Mother, Z.T. would never feel safe and would regress.

Dessesaure opined that Z.T. had progressed because he felt safe, had structure and a clean, stable place to live, and had parents that engaged him and made sure his needs were met. Schroeder testified that Mitch and Holly have provided Z.T. with a safe, secure home with an extended family. Z.T. called Mitch and Holly "dad" and "mother" and loved school. Schroeder opined that it would be best for Z.T. to maintain the security and progress he has made with Mitch and Holly and that another setback would set him back even farther. He also opined that it would be best for Z.T. to stay with them full time. Schroeder did not know whether Mother's parental rights should be terminated and testified that Z.T. loves Mother but did not want to see her. He also testified that if Mother's parental rights were maintained, Z.T. would have a fear that Mother would take him away from his home, which would be harmful to him. He noted that even coming to Longview caused Z.T. fear and anxiety. Dessesaure testified that Mother has not shown that she could work with Mitch and Holly, as would be required to be a possessory conservator with visitation rights. She also testified that she did not believe that Mother can maintain sobriety on her own or that she can meet Z.T.'s educational, medical, and emotional needs. Dessesaure testified that the Department wanted Mother's parental rights to be terminated and for Mitch and Holly to have the opportunity to adopt Z.T.

Holly also testified that she wanted to provide Z.T. with a safe, stable home where he can live a normal life. She testified that she did not believe that Mother can provide these for him. She also wants to adopt him and has plans to enable him to go to college or trade school so he can succeed in life.

13

Amanda Tornberg is a co-founder and the director of spiritual development and recovery at GB. She testified that she is a recovering addict, teaches classes, and has one-on-ones with the residents. She has known Mother since she came to GB over a year before trial meetings. Tornberg explained GB's program, which included individual goals for each resident. She described Mother as an active participant in the program. Although she needed encouragement at times, Mother appeared to be engaged most of the time and was very willing to keep working and progressing. Mother also attended Celebrate Recovery twice a week. She also had outside appointments with her counselor and parenting classes. Tornberg believed that Mother had changed since the beginning. She testified that Mother had done a lot of work owning her issues and choices, looking at her defects of character and relationship struggles, and demonstrating that she can take responsibility for her choices.

During the first part of the program, residents are not allowed to work. After eight months in the program, Mother got a job. At the time of trial, Mother worked full time with activities at a nursing home in Tyler. Mother also had outside appointments with her counselor and parenting classes. She also had her own transportation.

Tornberg also testified that Mother graduated from the program the month before trial and that she lived at the GB alumni house with another woman. In order to stay there, Mother was required to submit to random drug tests, stay sober, and attend classes and church. GB monitored Mother's attendance closely while she lived at the alumni house and would ensure that the support she needed was available after she left. Tornberg testified that Mother got a six-month lease that

14

may be extended. Mother has her own room, in which Z.T. would also sleep if he resided with her. Mother would be responsible for all school-related issues.

Tornberg believed that Mother could be a good mother so long as she stays vigilant, continues to work her program, stays plugged in, and maintains accountability. She testified that Mother has demonstrated that she can identify the triggers that lead to relapse and that she is able to set healthy boundaries. Tornberg was familiar with Mother's history and her inability to maintain sobriety once the Department was no longer involved. She could not guarantee it would not happen again. She opined that the difference this time was they looked at what led to Mother's relapses, which was her complacency and her not doing the things she needed to do.

Regarding her struggles with alcohol, Mother testified that she believed that her alcoholism began when she was thirty-five, three years before Z.T. was born. She testified that she had had treatment for it at Glen Oaks for a week when she was thirty-five, before the Department got involved. At that time, she also went to an aftercare program and AA for a while, but relapsed when she stopped attending those programs. She acknowledged that by 2015, it had progressed to where she was blacking out and her excess drinking was a danger to herself and to the people around her.

Mother also testified regarding her history with the Department and acknowledged that it was all related to her abuse of alcohol. She testified that in 2015, she had six months of intensive treatment and attended AA and Celebrate Recovery. She acknowledged that she had understood the danger that she had placed Z.T. in, but that she had nevertheless relapsed less than a year after Z.T was returned to her. Her testimony regarding the circumstances that led to Z.T.'s removal in

15

2016 was consistent with that of the Department's witnesses. After he was removed, she went to counseling and AA meetings and worked all of her services. Z.T. was returned to her care in January 2018, and she acknowledged that she understood the danger she had placed Z.T. in at that time also.

Mother also admitted to all of the circumstances that led to the October 2018 removal as testified to by the Department's witnesses. She thought that it had been traumatizing for Z.T. to live in those conditions and to see her in that condition. She testified that her latest relapse resulted from her breaking her arm in July 2018 and the pain medications that were given to her. Mother believed that this time would be different because the GB inpatient program had given her a home and a family, had enabled her to discover and confront her underlying sources of pain, and had helped her recognize her triggers and taught her how to avoid them. Although she could not say that she would not relapse again, she testified that she has a support system that she did not have in the past. She admitted, however, that when Z.T. had been returned to her the last two times, she had also said that she would not relapse again.

Mother testified regarding her employment and her transportation consistent with Tornberg's testimony. She testified that at the alumni house, she stayed in the master bedroom that had its own bathroom and that Z.T. would stay there with her. Her utilities were paid, but she bought her own groceries. Mother testified that she was saving money and planned to move to an apartment at some point. She wanted Z.T. returned to her, and she said that she had made arrangements with a friend to help transport him to and from school.

16

Mother testified that Z.T. had confusion and fear as a result of the removals. She agreed that Z.T. needed to see a counselor, and she testified that she would take him to one on her day off. At the time of trial, she had not made arrangements with one, and she had not consulted with West. She did not believe the testimony that Z.T. experienced a lot of fear and anxiety because of her visits. However, she testified that if Z.T. came back to live with her, he would have anxiety and he would regress from the improvement he has made, which she would address through counseling and spending time with him. She testified that it would be good for Z.T. to be with her because he needed her. Mother also claimed that Z.T. had been seeing a trauma-based counselor for fifteen months before his removal in October 2018. Although she thought that Ziggy lied when he said that she had relapsed two or three times between January and October 2018, she admitted that she had used food stamps to purchase cooking wine to drink.

## B.    Standard of Review

"The natural right existing between parents and their children is of constitutional dimensions." *In re E.J.Z.*, 547 S.W.3d 339, 343 (Tex. App.—Texarkana 2018, no pet.) (quoting *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). "Indeed, parents have a fundamental right to make decisions concerning 'the care, custody, and control of their children.'" *Id*. (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *Id*. (quoting *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). This Court is required to "engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights." *Id*. (quoting *A.B.*, 437 S.W.3d at 500). "[I]nvoluntary

17

termination statutes are strictly construed in favor of the parent." *Id.* (quoting *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (quoting *Holick*, 685 S.W.2d at 20)).

"In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest." *Id.* (citing TEX. FAM. CODE ANN. § 161.001 (Supp.); *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012)). "'Clear and convincing evidence' is that 'degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting TEX. FAM. CODE ANN. § 101.007) (citing *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009)). "This standard of proof necessarily affects our review of the evidence." *Id.*

"There is a strong presumption that keeping a child with a parent is in the child's best interest." *In re J.A.S., Jr.*, No. 13-12-00612-CV, 2013 WL 782692, at \*7 (Tex. App.—Corpus Christi Feb. 28, 2013, pet. denied) (mem. op.) (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam)). "Termination 'can never be justified without the most solid and substantial reasons.'" *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)).

In determining the best interests of the child, courts consider the following *Holley* factors:

> (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*Id.* at 818–19 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *see In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *see also* TEX. FAM. CODE ANN. § 263.307(b). Further, we may consider evidence used to support the grounds for termination of parental rights in the best-interest analysis. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

"In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that the grounds for termination were proven." *In re L.E.S.*, 471 S.W.3d 915, 920 (Tex. App.—Texarkana 2015, no pet.) (citing *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.)). "We assume the trial court, acting as fact-finder, resolved disputed facts in favor of the finding, if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or the credibility of which reasonably could be doubted." *Id.* (citing *J.P.B.*, 180 S.W.3d at 573).

"In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing." *Id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam)). "We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine 'whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations.'" *Id.* (quoting *H.R.M.*, 209 S.W.3d at 108; *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)); *In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so

19

significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *J.F.C.*, 96 S.W.3d at 266). In making this determination, we undertake "an exacting review of the entire record with a healthy regard for the constitutional interests at stake." *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *C.H.*, 89 S.W.3d at 26)).

"Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, 'the rights of natural parents are not absolute; protection of the child is paramount.'" *Id.* (quoting *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003); *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)) (citing *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003)). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *Id.* (quoting *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.) (citing *C.H.*, 89 S.W.3d at 26)).

### C. Analysis

#### 1. Does Section 161.004 Limit Our Review of the Evidence?

Mother does not challenge the sufficiency of the evidence supporting the trial court's findings that her parental rights should be terminated under statutory grounds (D) and (E). Rather, she only challenges the legal and factual sufficiency of the evidence supporting the trial court's finding that termination of her parental rights was in the best interest of Z.T. In this regard, Mother points out that much of the evidence referred to the two prior removal cases in 2015 and 2016, and she argues that the Department relied on the evidence from these two dismissed cases to support

20

termination in this case.  This, she argues, is prohibited by Section 161.004 of the Texas Family

Code.[3]

Section 161.004 provides:

(a)      The court may terminate the parent-child relationship after rendition of an order that previously denied termination of the parent-child relationship if:

(1)      the petition under this section is filed after the date the order denying termination was rendered;

(2)      the circumstances of the child, parent, sole managing conservator, possessory conservator, or other party affected by the order denying termination have materially and substantially changed since the date that the order was rendered;

(3)      the parent committed an act listed under Section 161.001 before the date the order denying termination was rendered; and

(4)      termination is in the best interest of the child.

(b)      At a hearing under this section, the court may consider evidence presented at a previous hearing in a suit for termination of the parent-child relationship of the parent with respect to the same child.

TEX. FAM. CODE ANN. § 161.004.

In support of her argument, Mother points to *In re D.N.*, 405 S.W.3d 863 (Tex. App.—

Amarillo 2013, no pet.).  In *D.N.*, the trial court had entered an agreed order in 2011 that named

the Department permanent managing conservator of the child, named the parents possessory

conservators, and denied the Department's request for termination of the parents' parental rights.

*Id*. at 867.  About eight months later, the Department filed a motion to modify and sought to

terminate the mother's parental rights on various statutory grounds contained in Section

---

[3]Although Mother asserts this argument as a separate issue, she briefs it as part of her sufficiency analysis.

161.001(1). After the mother's parental rights were terminated under Section 161.001(1), subsections (D), (E), (N), (O), and (Q), the mother appealed. *Id.* at 868.

The Amarillo Court of Appeals concluded that when a trial court has previously entered an order denying termination, it can subsequently "terminate the parent-child relationship . . . using Section 161.001 alone if termination is sought on *evidence of acts or omissions having occurred since the earlier order in which termination was denied.*" *Id*. at 870 (citing *In re K.G.*, 350 S.W.3d 338, 352 (Tex. App.—Fort Worth 2011, pet. denied)). But in order "to rely on acts or omissions evidence of which has been presented to the trial court before the earlier order denying termination, the Department must garner sufficient evidence of section 161.004's elements, including a material and substantial change of the parties' circumstances." *Id*. (citing *In re K.G.*, 350 S.W.3d at 352). The court of appeals went on to conclude that since the trial court had previously entered an order denying termination, its appellate review of a termination under Section 161.001 was "limited to evidence of predicate acts or omissions under section 161.001 which would support termination and which have occurred or come to pass in the time between the trial court's . . . order denying termination and the [final] hearing." *Id*. at 871.

At least one of our sister courts of appeals, however, has held that when a trial court has previously denied the Department's request for termination of parental rights, both the trial court and the appellate courts may consider evidence of the parent's conduct before the entry of the decree denying the Department's request "to corroborate evidence of her similar conduct since the decree." *In re S.B.*, No. 02-18-00310-CV, 2019 WL 1388760, at *4 (Tex. App.—Fort Worth Mar. 28, 2019, pet. denied) (mem. op.).

22

In this case, we need not decide whether Section 161.004 would preclude our consideration of Mother's conduct before the orders entered in the prior cases. Under the plain language of Section 161.004, it is applicable only when the trial court has rendered "an order that previously denied termination of the parent-child relationship." TEX. FAM. CODE ANN. § 161.004(a). In this case, there is nothing in the record that shows that the trial court had previously rendered an order that denied termination of the parent-child relationship. The only testimony regarding the previous two cases was that the Department dismissed both of them.[4] Therefore, we find that Section 161.004 is not applicable in this case.

## 2. The *Holley* Factors

Although Z.T. did not testify, there was ample testimony from which the trial court could infer his desires. Although they all agreed that Z.T. loved Mother, Dessesaure, Holly, and West all testified that Z.T. would exhibit anxiety and fear and that he would act out aggressively before and after his visits or telephone calls with Mother. West testified that Z.T. verbally expressed both that he did not want to live with Mother and that he wanted to stay with Mitch and Holly, whom

---

[4]Mother also points to certain documents contained in the supplemental clerk's record. These documents consist of copies of the original petition for protection of a child, for conservatorship, and for termination, the docket sheet, and the permanency hearing order before final hearing filed in the trial court's cause number 2015-306-DR, and copies of the original petition for protection of a child, for conservatorship, and for termination, the docket sheet, and the permanency hearing order before final hearing filed in the trial court's cause number 2016-2374-DR. However, nothing in the record indicates that these documents were either admitted as evidence at trial or were filed of record in the clerk's record in the trial court's cause number 2018-2052-DR, which is the subject of this appeal. Since these documents were not before the trial court, we cannot consider them.

We note, however, that even if we were to consider them, the docket sheets in both cause number 2015-306-DR and cause number 2016-2374-DR recite that those causes were dismissed at the Department's request. In addition, the permanency hearing order before final hearing entered in each of those causes recite that the respective causes were dismissed pursuant to Section 161.203 of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 161.203 (requiring that a suit to terminate may not be non-suited or dismissed without the approval of the trial court and that such dismissal is without prejudice). Consequently, our conclusion that there was no evidence that showed that the trial court had previously rendered an order that denied termination of the parent-child relationship would remain the same.

23

he considered his family. She also testified that Z.T. feared his Longview visits with Mother because he was afraid that he would not be returned home to Mitch and Holly. We find that the first *Holley* factor supports the trial court's best interest finding.

Schroeder, Dessesaure, Holly, and West testified that Z.T. has made great strides in his recovery from the emotional and psychological trauma he suffered while living with Mother. They also testified of the setbacks that Z.T. experienced after each visit or telephone call with Mother. West opined that continuing visitations with Mother would harm Z.T. emotionally, and Schroeder opined that continuing these visitations would keep Z.T. in the fear that Mother would take him away. West and Dessesaure also opined that returning Z.T. to Mother's care would cause him to regress and possibly cause him permanent emotional and developmental damage. All of them attributed Z.T.'s progress to the safety and stability in his life provided by Mitch and Holly. Although Mother recognized that Z.T. had experienced trauma as a result of her actions and recognized his need for counseling, she did not accept or recognize that Z.T. continued to experience fear and anxiety during their visits. We find that the second and third *Holley* factors strongly support the trial court's best-interest finding.

The testimony also showed that Mitch and Holly were able to appropriately meet the physical, emotional, educational, and psychological needs of Z.T. and to provide him with a safe, stable, and caring home. Tornberg testified that she thought Mother would be a great mother if she maintained her sobriety, but she gave no factual testimony of Mother's parenting skills. Mother had completed all of the services required by the Department, and she had apparently made commendable efforts in attaining sobriety. However, she had spent the majority of the case in an

24

inpatient program, from which she had graduated only one month before the final hearing. In addition, her living arrangements at the time of the final hearing were in a residence run by that same program, at which she was still under close supervision. Also, she had obtained full-time employment only a month before the hearing. Consequently, the trial court could have reasonably concluded that Mother had not established that she had the parenting skills to meet the needs of Z.T. and that she had not established that she could provide him with a safe, stable home environment. We find that the fourth and seventh *Holley* factors also support the trial court's best-interest finding.

There was very little testimony regarding the programs available to either Mother or Mitch and Holly to assist them in meeting the needs of Z.T. Consequently, we find this factor to be neutral.

The Department's plan for Z.T. was adoption by Mitch and Holly. Holly testified that she wanted to provide Z.T. with a stable, caring home in which he could have a normal life and could be successful in life. Mother planned to save her money so she could eventually move into an apartment with Z.T. She also had made plans to ensure his school attendance, and she recognized his need for counseling. We also find that this factor is neutral.

There was abundant evidence that Mother had repeatedly placed Z.T. in danger as a result of her excessive drinking. This included Mother incapacitating herself so that she could not have responded in an emergency and her allowing Z.T. to eat and sleep on Mother's mattress near where she had defecated and vomited. In addition, there was compelling testimony regarding the trauma inflicted on Z.T. by Mother's actions that caused him to shut down emotionally and

25

developmentally. By her own admission, Mother recognized the danger to Z.T. caused by her excessive drinking, but she continued to drink. Mother blamed her actions on her alcoholism, the pain she experienced from losing her father at a young age, and pain medication given to her when she broke her arm. However, she also testified that she recognized that she had a drinking problem several years before Z.T. was born and acknowledged that, although with help she was able to attain sobriety for some periods of time, she had not been able to maintain sobriety. We find that the eighth and ninth *Holley* factors support the trial court's best-interest finding.

Based on this record, we find that the evidence was sufficient for a fact-finder to reasonably form a firm belief or conviction that termination of Mother's parental rights was in the best interest of Z.T. Consequently, we find that there was legally and factually sufficient evidence to support the trial court's best-interest finding.[5] We overrule Mother's issues attacking the sufficiency of the evidence supporting the trial court's best-interest finding.

## II. Mother's Waiver or Estoppel Complaint Was Waived

In her fourth issue, Mother contends that the Department waived its action for termination of her parental rights and that it was estopped to seek termination. Mother points out that the

---

[5]Mother contends that under somewhat similar facts, we have previously found that denying access to a child was not in the child's best interest, citing *In re Walters*, 39. S.W.3d 280, 287 (Tex. App.—Texarkana 2001, no pet.). Mother misconstrues our holding in *Walters*. In *Walters*, the trial court entered a divorce decree naming the father sole managing conservator and appointing the mother as possessory conservator with possession of the child as mutually agreed by the parties. *Id*. at 282–83. On appeal, the mother contended that that order amounted to a complete denial of access to and possession of the child. *Id*. at 285. In our analysis, we concluded that the trial court could not have intended to completely deny access to the child because it appointed the mother possessory conservator, which implied a finding that any danger she posed to the child's physical or emotional welfare could be remedied by an order restricting the mother's possession and access. *Id*. at 287. We then held that the trial court did not intend to completely restrict the mother possession of and access to the child, but that the order was deficient because it was not sufficiently specific as to the times and conditions of the mother's possession of or access to the child. *Id*. at 288.

Department gave her a family service plan that outlined the steps that were necessary to return Z.T. to his home and to Dessesaure's testimony that Mother had done everything the Department asked. She argues that she did not receive any notice that the Department was seeking termination of her parental rights[6] and that the Department consistently represented in its Permanency Reports that its goal was a relative/fictive kin conservatorship with a concurrent goal of family reunification. Mother asserts that in reliance on those representations, she worked on her family service plan for over a year. This, she argues, was a waiver of the Department's right to seek termination of her parental rights and that the Department was estopped to seek termination.

Rule 94 of the Texas Rules of Civil Procedure provides that "[i]n a pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction . . . , estoppel . . . , waiver, and any other matter constituting an avoidance or affirmative defense." TEX. R. CIV. P. 94. "It has long been held that the purpose of Rule 94 is to give the opposing party notice of the defensive issues to be tried." *In re P.D.D.*, 256 S.W.3d 834, 839 (Tex. App.—Texarkana 2008, no pet.) (citing *Land Title Co. of Dallas, Inc. v. F.M. Stigler, Inc.*, 609 S.W.2d 754, 756 (Tex. 1980); *Hunter v. Carter*, 476 S.W.2d 41, 45 (Tex. App.—Houston [14th Dist.] 1972, writ ref'd n.r.e.); *Musso v. Cronley*, 422 S.W.2d 840, 841 (Tex. App.—Waco 1967, no writ)). Generally, if affirmative defenses, such as waiver and estoppel, are not pleaded, they are waived.[7] *In re S.A.P.*, 156 S.W.3d 574, 576 (Tex. 2005); *Shoemake v. Fogel*, 826 S.W.2d 933, 937 (Tex. 1992).

---

[6]Mother concedes, however, that the Department specifically requested termination of her parental rights in both its original petition and it first amended petition.

[7]Mother does not contend that these issues were tried by consent.

27

In this case, the Department requested termination of Mother's parental rights in both its original petition and in its first amended petition, its live pleading at time of trial. Mother never filed an answer asserting that the Department had waived, or that it was estopped to assert, its right to seek termination of Mother's parental rights. Consequently, Mother has waived this issue. We overrule Mother's fourth issue.

## III. Disposition

For the reasons stated, we affirm the trial court's judgment.

Ralph K. Burgess
Justice

Date Submitted:     July 27, 2020
Date Decided:       August 5, 2020